## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

TINA CARR and YVETTE COLON,

        Plaintiffs,

    v.

ELISABETH DEVOS, in her official capacity
as Secretary of the U.S. Department of
Education,

        Defendant.

Case No.: 19-cv-06597

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

## <u>INTRODUCTION</u>

1.    Plaintiffs Tina Carr and Yvette Colon borrowed student loans from the United States Department of Education (the Department) to attend the Sanford-Brown Institute (Sanford-Brown), a notoriously abusive and now-defunct for-profit college owned and operated by Career Education Corporation.

2.    Sanford-Brown grossly misrepresented its career training programs and Plaintiffs' employment prospects to induce Plaintiffs to enroll and remain enrolled. Plaintiffs did not receive any of the promised benefits of attending Sanford-Brown, and in fact, their careers and lives have been severely harmed by their attendance and the crushing student loan debt that resulted from it.

3.    The Office of the Attorney General of the State of New York (OAG) found that Sanford-Brown systematically made the same types of false and deceptive representations to other prospective students that it made to Plaintiffs, in violation of New York consumer protection law. The Attorneys General of all forty-nine other states found similar abuses.

4.    Federal law, regulations, and Plaintiffs' promissory notes allow Plaintiffs to assert

Sanford-Brown's misconduct to the Department as a basis for cancellation of their loans.

5.      In March 2015, each Plaintiff invoked this right to cancellation of her loans by submitting to the Department an application for "borrower defense," containing evidence of Sanford-Brown's misconduct. According to the Department, Plaintiffs were two of the first five individuals to submit borrower defense applications.

6.      Plaintiffs have been waiting *over four years*, but the Department has failed to adjudicate their borrower defense applications.

7.      The Department has repeatedly stated that it intends to process borrower defense applications in the order that they were received. The applications of over 158,000 individuals who submitted after Plaintiffs also remain pending. Virtually all borrower defense applicants, like Plaintiffs, attended for-profit colleges.

8.      The Department has not granted a single borrower defense application for any borrower in the past year.

9.      The Department publicly stated that it has no timetable for when it will resume deciding borrower defense applications.

10.     Plaintiffs have experienced and continue to experience harm from the Department's unreasonable delay in resolving their applications and continued enforcement of their loans, in the form of damaged credit, actual and potential collections, and the emotional distress of years of uncertainty about their financial status and future. Ms. Carr's and Ms. Colon's loan balances have increased more than $2,300 and $5,500, respectively, while their applications have been pending.

11.     Plaintiffs bring this action under the Administrative Procedure Act, 5 U.S.C. § 706, to compel Defendant to adjudicate their borrower defense applications and have the delay

declared unlawful.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1331, the Mandamus Act, 28 U.S.C. § 1361, the Administrative Procedure Act ("APA"), 5

U.S.C. §§ 701-706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one of the

Plaintiffs resides in this district and because a substantial part of the events giving rise to these

claims occurred in this district.

## PARTIES

14.     Plaintiff Tina Carr lives in Lindenhurst, New York. Ms. Carr borrowed federal

Direct student loans to attend a Medical Assisting program at Sanford-Brown's Melville, New

York campus.

15.     Plaintiff Yvette Colon lives in New York, New York. Ms. Colon borrowed

Federal Family Education Loans ("FFEL") and private student loans to attend a Non-Invasive

Cardiovascular Technology (Sonography) program at Sanford-Brown's New York, New York

(Manhattan) campus.

16.     Defendant Elisabeth DeVos is the Secretary of Education (Secretary) and charged

with the supervision and management of all decisions and actions of the United States

Department of Education. Plaintiffs sue Secretary DeVos in her official capacity.[1]

## STATUTORY AND REGULATORY BACKGROUND

17.     The Higher Education Act of 1965 ("HEA") provides the statutory authorization

---

[1] Plaintiffs allege that Secretary DeVos is responsible by statute for all official actions and activities of the
Department. As such, all allegations in this Complaint against the U.S. Department of Education are made against
Defendant DeVos.

3

for federal student loans, including the Direct Loan and Federal Family Education Loan ("FFEL") programs, 20 U.S.C. §§ 1071, 1087a.

18.     Under the Direct Loan program, the federal government directly issues student loans.  20 U.S.C. § 1087a.

19.     Under the FFEL program, private lenders issued subsidized student loans, which were backed by guaranty agencies and in turn insured by the Department. 20 U.S.C. § 1078(b)-(c). No new loans can be made under the FFEL program, as of July 1, 2010. The Department retains ultimate responsibility for FFEL loans, which are often transferred to the Department.

20.     Direct and FFEL loans have the same terms, conditions, and benefits under the HEA. 20 U.S.C. § 1087e(a)(1).

21.     Direct and FFEL loan statutes, regulations, and promissory notes provide that acts or omissions of the school attended by the borrower that give rise to a cause of action under applicable state law provide a basis for discharge (cancellation) of the borrower's loans (a "borrower defense"). 20 U.S.C. §§ 1087e(a)(l), 1087e(h); 34 C.F.R. §§ 682.209(g), 685.206(c)(1).

22.     A successful borrower defense results in the cancellation of remaining obligation on the loan, return of money already collected, removal of negative credit reporting associated with the loan, and/or restoration of eligibility for federal financial aid.

23.     The Department is authorized to recoup discharged funds from the school the student attended. The Department also has the authority to audit, fine, suspend, limit, and terminate the participation of any institution in the federal student aid programs for violations of any applicable statutes or regulations. 20 U.S.C. § 1094(c).

24.     The Secretary is required to resolve (that is, either grant or deny) any borrower

4

defense application.  5 U.S.C. § 555(e); 20 U.S.C. § 1087e(h); 34 C.F.R. § 685.206(c)(1).

25.     The Department has repeatedly acknowledged that it has a mandatory duty to resolve borrower defense applications.

26.     If a borrower's loans are defaulted and the borrower has not received a discharge, the Secretary may exercise extraordinary collection powers, including wage garnishment and tax refund and federal benefit offset. 31 U.S.C. §§ 3716, 3720A, 3720D; 20 U.S.C. § 1095a(a).

27.     There is no statute of limitations on the Secretary's collection of student loans, and they are presumptively non-dischargeable in bankruptcy. *See* 20 U.S.C. § 1091a(a)(2); 11 U.S.C. § 523(a)(8).

28.     As a result, unless a borrower receives a discharge, her student loans can follow her for the rest of her life.

## FACTUAL ALLEGATIONS

### *Tina Carr's Borrower Defense Application*

29.     After moving to New York to take care of her mother who had been diagnosed with cancer, Ms. Carr decided to become credentialed in medical assisting then gain additional hands-on work experience before pursuing her ultimate goal of becoming a registered nurse.

30.     In March 2011, Ms. Carr enrolled in a Medical Assisting program at Sanford-Brown's Melville, New York campus. Ms. Carr borrowed $14,576 in federal Direct loans to attend this program.

31.     In order to induce Ms. Carr to enroll, and remain enrolled, Sanford-Brown made numerous false representations and material omissions regarding the school's ability to place graduates in jobs, the salary she would earn in such jobs, the support it would provide her in securing post-graduate employment, and the transferability of its credits to other programs,

including that:

- Sanford-Brown offered "Career Placement Assistance Services" and "career-focused education";

- If Ms. Carr studied hard, there was "a promise of employment" as a medical assistant;

- Sanford-Brown had an approximately 80 percent job placement rate, and that placement rates for diligent students were even higher;

- Ms. Carr would secure a job as a medical assistant, and that once she did, her future employer would likely pay for her further education, including a bachelor's degree and nursing school;

- Ms. Carr would earn more, and could earn up to $60,000 per year as a medical assistant with an associate degree; and

- Ms. Carr's externship experience would lead to a permanent job.

32.      Ms. Carr graduated from Sanford-Brown in October 2012 with an associate degree in Medical Assisting and 4.0 grade point average. After graduation, Ms. Carr diligently searched for a job as a medical assistant, but could not find employment with her Sanford-Brown credential.

33.      Ms. Carr sought the promised job placement assistance from Sanford-Brown's career services staff, but they did not help her to secure even a single interview.

34.      Because her degree was worthless and she could not obtain employment in her field, Ms. Carr became homeless and needed a steady source of income, so she began to work as a seasonal cashier at J.C. Penney.

35.      On March 18, 2015, Ms. Carr submitted a borrower defense application to the Department and its collection agency, FMS Investment Corporation.

36.      Ms. Carr's application sought cancellation of her federal student loans, which at the time totaled $16,692.

37.      Ms. Carr's application contained a letter explaining the legal basis for her defense,

a sworn affidavit, and nearly 100 pages of exhibits. The application explained in detail how she

had enrolled at Sanford-Brown on the basis of unlawful false statements and material omissions.

38.     Ms. Carr's application attached an "Assurance of Discontinuance" that the New

York Office of the Attorney General (OAG) reached with Sanford-Brown, detailing the OAG's

findings about the school's misconduct.

39.     The Assurance of Discontinuance followed a years-long investigation by OAG

into Sanford-Brown. *See* N.Y. Gen. Bus. Law § 350-d (authorizing OAG to investigate

potentially fraudulent practices and initiate civil proceedings for injunctive relief or restitution);

N.Y. Exec. L. § 63(12) (authorizing OAG to investigate and to bring an enforcement action

against "persistent fraud or illegality in the carrying on, conducting, or transaction of business").

40.     OAG concluded that Sanford-Brown violated New York General Business Law

§ 349(a), which prohibits "[d]eceptive acts or practices in the conduct of any business, trade or

commerce or in the furnishing of any service in this state."

41.     Among other things, the Assurance of Discontinuance stated the OAG's findings

that from approximately 2008 to 2011, Sanford-Brown violated New York General Business

Law § 349 by misrepresenting its job placement rates, accreditation status, and the transferability

of its credits.

42.     The categories of misrepresentations described by the OAG were the same ones

that induced Ms. Carr to enroll and remain enrolled at Sanford-Brown.

43.     For example, the OAG found that Sanford-Brown's Melville campus (where Ms.

Carr attended) represented to students that it had a 70 percent placement rate in the 2009-2010

cohort, but the actual rate was 26.1 percent.

44.     On April 10, 2015, the Department responded to Ms. Carr's borrower defense

application by stating that a school's misrepresentations could not provide a legal basis for a borrower to be relieved of the obligation to repay her federal loans. The letter further stated that "Ms. Carr is responsible for repayment of this debt" and that she "may be subject to enforced collection actions including wage garnishment and lawsuit."

45.     Less than a month later, in response to media inquiries about this letter and a similar letter sent to Ms. Colon, the Department publicly disavowed this position. A Department spokesperson said: "Any statement that these borrowers did not have the right to assert defense to repayment claims based on alleged fraud by their institution was incorrect. . . . We will give full consideration to the claims. . . . We regret the difficulty that inaccurate information may have caused to any student borrowers."[2]

46.     On July 26, 2015, the Department notified Ms. Carr that it intended to collect on her loans through Treasury offset (seizure of her tax refund).

47.     On August 10, 2015, Ms. Carr challenged the offset on the basis of her borrower defense, and re-submitted her borrower defense application to the Department.

48.     On August 12, 2016, the Department sent a letter to Ms. Carr providing "information on the status of" her borrower defense application. The letter acknowledged that the Department had received and reviewed Ms. Carr's borrower defense application, and explained that "[i]f Ms. Carr's borrower defense claim is successful, her federal loans . . . will be discharged. If Ms. Carr's borrower defense claim is denied, she will not receive a discharge of any of her loans [and s]he will be responsible for repaying those loans, including interest that accrued. . . ."

49.     The Department has taken no further action on Ms. Carr's borrower defense

---

[2] Shahien Nasiripour, Obama Administration Improperly Denies Student Loan Debt Relief, Huffington Post (May 8, 2015), *available at* https://www.huffpost.com/entry/federal-student-loans-defense-against-repayment_n_7242136.

application.

50.     As of May 2019, the Department represented that the status of Ms. Carr's

application was "review in progress."

51.     The balance on Ms. Carr's federal student loans now totals over $19,000 and

continues to increase every day due to mounting interest.

### *Yvette Colon's Borrower Defense Application*

52.     After working in the medical field for many years as a medical assistant and

receptionist, Ms. Colon sought to advance her career by becoming a cardiac sonographer.

53.     In September 2006, Ms. Colon enrolled in a Non-Invasive Cardiovascular

Technology (Sonography) certificate program at Sanford-Brown's New York City campus. Ms.

Colon obtained $14,838 in FFEL loans to attend this program.

54.     In order to induce Ms. Colon to enroll, and remain enrolled, Sanford-Brown made

numerous false representations and material omissions regarding the sonography program's

accreditation, the school's job placement assistance, and transferability of its credits, including

that:

- Sanford-Brown's cardiac sonography program was accredited (a representative also pointed to a plaque on the wall, which had the word "accredited" on it);

- Ms. Colon would definitely be able to get a job as a sonographer after graduation;

- Ms. Colon's credits would transfer to an associate degree program; and

- Ms. Colon's internships would lead to an ultrasound job.

55.     Ms. Colon graduated from Sanford-Brown in April 2008 with a certificate in

Non-Invasive Cardiovascular Technology (Sonography). After graduation, Ms. Colon attempted

to register for the licensure exam for sonographers (the ARDMS exam), but was informed that

she could not sit for the exam because she had not graduated from an accredited sonography

program.

56.     Ms. Colon diligently searched for a job as a sonographer, but no employer would

hire her unless she passed the ARDMS exam.

57.     Ms. Colon called Sanford-Brown regularly for months to ask if they knew of any

available jobs, but in all that time they gave her only one referral to a job interview. It did not

lead to a job offer.

58.     Because her Sanford-Brown credential was worthless, Ms. Colon could not find

work in the cardiac sonography field. She eventually returned to a job in medical billing. In

2008, Ms. Colon tried to transfer her Sanford-Brown credits to the Borough of Manhattan

Community College (BMCC), but BMCC informed her that the credits would not transfer

because Sanford-Brown's program did not have the right accreditation.

59.     On October 24, 2014, the OAG notified Ms. Colon that she was eligible for a

restitution payment under the OAG's settlement pertaining to Sanford-Brown. Ms. Colon applied

for restitution from this fund, and was awarded $3,094.93.

60.     On March 9, 2015, Ms. Colon submitted a borrower defense application to the

Department and its contractor servicing her loans, Navient.

61.     Ms. Colon's application sought cancellation of her federal student loans, which at

the time totaled $22,130.

62.     Ms. Colon's application contained a letter explaining the legal basis for her

defense, a sworn affidavit, and over 100 pages of exhibits. The application explained in detail

how she had enrolled at Sanford-Brown on the basis of unlawful false statements and material

omissions.

63.     Ms. Colon's application attached the Assurance of Discontinuance documenting

OAG's findings regarding Sanford-Brown's misconduct.

64.     The categories of misrepresentations described by the OAG were the same ones that induced Ms. Colon to enroll and remain enrolled at Sanford-Brown.

65.     For example, the OAG found that Sanford-Brown failed to disclose to its students that its health services programs were not programmatically accredited. The OAG found that graduates of these programs were not eligible to sit for the qualifying exam, which as viewed by employers as a requirement for employment.

66.     On April 24, 2015, Navient sent a letter to Ms. Colon's stating that it "was unable to forgive the balance on Ms. Colon's Federal" loans. The letter further stated that her loans could only be forgiven upon death or disability, or a school's closure. The letter further provided various options for repayment.

67.     On August 12, 2016, the Department sent a letter to Ms. Colon providing "information on the status of" Ms. Carr's borrower defense application. The letter stated that by May 6, 2015, the Department had "determined that" Ms. Colon's borrower defense application "was substantially complete." The Department stated that it would "inform" Ms. Colon "once a determination has been made in relation to the request for a discharge."

68.     The Department has taken no further action on Ms. Colon's borrower defense application.

69.     As of April 2019, the Department represented that the status of Ms. Colon's application was "review in progress."

70.     The balance on Ms. Colon's federal student loans now totals over $27,700 and continues to increase every day due to mounting interest.

11

### *The Department's Failure to Resolve Plaintiffs' Borrower Defense Applications*

71.     For over four years, the Department has delayed resolving Plaintiffs' borrower

defense applications.

72.     Ms. Carr and Ms. Colon submitted their applications in March 2015. According to

the Department, prior June 2015, it had received only five borrower defense applications.

73.     Thus, Plaintiffs were among the first five individuals to ever submit borrower

defense applications.

74.     As of December 31, 2018, the most recent date for which data is publicly

available, 158,110 borrower defense applications, including Plaintiffs', remained pending before

the Department. All but three of these applications (at most) were submitted after Plaintiffs'.

75.     The Department has repeatedly stated that it "processes applications in the order

in which they are received."

76.     The Department has repeatedly stated that it would rely on evidence established

by appropriate authorities in evaluating borrower defense applications. Among such appropriate

authorities are state attorneys general.

77.     Accordingly, under the Department's policies, it would rely on the OAG findings

regarding Sanford-Brown in resolving Ms. Carr's and Ms. Colon's applications.

78.     The Department's resolution of Ms. Carr's and Ms. Colon's applications would

not require any further investigation into Sanford-Brown and thus would be straightforward.

### *The Department's Policy Not to Resolve Borrower Defense Applications*

79.     The Department's delay in resolving Plaintiffs' applications is unreasonable.

80.     The Department's unreasonable delay in resolving Plaintiffs' borrower defense

applications is part of an informal policy not to resolve borrower defense applications despite the

12

Department's mandatory duty to do so.

81.    That policy harms, and is intended to harm, borrowers, and favors the for-profit schools that defrauded them.

82.    The Department's informal policy not to resolve borrower defense applications represents neither a reasoned policy decision nor a defensible allocation of limited resources. To the contrary, the Department's informal policy of not resolving borrower defense applications is part of a wholesale abdication of its duty to grant or deny borrower defense claims.

83.    On information and belief, the Department's informal policy not to resolve borrower defense applications is in bad faith.

84.    The Department has not granted or denied any borrower defense applications in the past year.

85.    Prior to January 20, 2017, the Department granted approximately 32,000 borrower defense applications.

86.    The vast majority of the applications granted before January 20, 2017, were from students who had attended schools within the large for-profit college chain Corinthian Colleges, based on the California Attorney General's findings that Corinthian Colleges violated state law. The Department also granted applications from students of the American Career Institute, based on findings of the Massachusetts Attorney General.[3]

87.    In early 2017, however, the Department instructed its staff not to submit any additional borrower defense claims for approval.

88.    Around that same time, Department staff members were also instructed to stop engaging in legal analysis that would provide the basis for new categories of claims that qualify

---

[3] The Department also granted a small number (thirty-three) individual applications from students who attended ITT Technical Institute.

for discharge.

89.    Since January 20, 2017, the only applications the Department has resolved were from students of Corinthian Colleges, which shared nearly identical factual and legal issues with previously-resolved claims.

90.    On information and belief, since early 2017, the Department has not performed any legal analysis that would be necessary to grant claims from any borrowers who, like Plaintiffs, attended schools other than Corinthian Colleges, American Career Institute, and ITT Technical Institute.

91.     On information and belief, the Department currently has no process in place to resolve any borrower defense applications.

92.    In June 2018, the Department acknowledged to the Senate Appropriations Committee that it had "put a hold on certain borrower defense evaluation activities[.]"

93.    In May 2019, Diane Auer Jones, a senior Department official, testified to a House committee that there is no timetable for the adjudication of borrower defense claims.

94.    By contrast, the Department regularly grants approximately 100,000 applications for other student loan discharges, such as discharges due to death, disability, school closure, or false certification, each year.

95.    The Department routinely adjudicates these other student loan discharge applications in three months or less.

96.    The Department has deliberately understaffed the office charged with adjudicating borrower defense applications, called the "Borrower Defense Unit."

97.    On information and belief, the Borrower Defense Unit currently has only two staff members.

98.     On information and belief, these two staff members are the sole individuals responsible for processing the more than 158,000 pending borrower defense applications.

99.     Meanwhile, since January 2017, the Department has devoted substantial resources toward attempting to delay and twice rewrite borrower defense regulations to make it more difficult for borrowers to obtain relief.

100.     The Department's Inspector General "disagreed with the regulatory delay" of borrower defense rules.

101.     A federal district court vacated the Department's delay of borrower defense regulations, as the delay "did not come close" to being lawful under the APA. The Department's defense of the delay was "unpersuasive," "mere boilerplate," "unsupported by any analysis," "at odds with the Department's prior conclusion" and "lack[ing] in any meaningful analysis," *Bauer v. DeVos*, Case No. 17-1330 (RDM), Memorandum and Opinion, Doc. No. 87 (Sept. 12, 2018, D.D.C.).

102.     During a September 2017 speech to the Mackinac Republican Leadership Conference, Secretary DeVos characterized borrower defense applications as follows: "[A]ll one ha[s] to do [is] raise his or her hands to be entitled to so-called free money."

103.     Because the Department can recoup any discharged funds from the student's school, granting borrower defense applications has the potential to financially injure the companies that own the for-profit schools borrowers attended.

104.     Numerous Department officials charged since January 2017 with running the borrower defense application process are closely affiliated with the for-profit school industry, including with Career Education Corporation, the company that operated Sanford-Brown.

105.     For example, both the Department official who led the Department's February

2017 review of the borrower defense application process and the Department official currently overseeing the borrower defense application process are former vice presidents at Career Education Corporation.

106.    To conceal its deliberate refusal to process borrower defense applications, the Department has repeatedly misrepresented that it is continuing to evaluate borrower defense applications.

107.    For example, in or around early 2017, the Department falsely informed loan servicers and guaranty agencies that it would take approximately twelve to fourteen months from the time of submission for a borrower defense claim to be resolved.

108.    The Department has repeatedly misrepresented to individual borrowers, members of Congress, and the public that it is continuing to "process" and "evaluate" borrower defense applications.

### *Harm to Plaintiffs*

109.    Plaintiffs have been, and continue to be, harmed by Defendant's failure to resolve their borrower defense applications.

110.    The harm to Plaintiffs includes both monetary harm and harm to their health and welfare.

111.    Plaintiffs suffered emotional distress from Sanford-Brown's false promises. The Department's failure to resolve their borrower defense applications has compounded and exacerbated that emotional distress, because there is still no resolution to their decade-long ordeal.

112.    Ms. Carr suffered from depression and anxiety as a result of her experience of being defrauded by Sanford-Brown and being unable to obtain a job after obtaining her degree.

16

Because of the Department's failure to resolve her borrower defense application, her Sanford-Brown loans continue to hang over her, with no end in sight, causing these feelings to persist. This negatively affects Ms. Carr's relationships with her partner and friends.

113.    Ms. Colon continues to feel anger and frustration because Sanford-Brown lied to her about its accreditation and she was unable to obtain a job in her field of study. Ms. Colon finds that thinking about her Sanford-Brown loans causes her substantial stress because it reminds her of her experience of being defrauded, and so she tries not to do so. But the Department's failure to adjudicate her borrower defense application forces her to continue to think about these experiences.

114.    Plaintiffs have suffered additional distress and anxiety from the uncertainty surrounding their borrower defense applications. Plaintiffs feel that they are unable to plan for the future because their applications are pending and their financial future remains unknown.

115.    Ms. Carr feels that waiting for her application to be resolved is like being "stuck in quicksand" because it prevents her from making future plans. This uncertainty contributes to Ms. Carr's anxiety.

116.    Because her application is unresolved, Ms. Colon feels like she does not have a future other than working. Ms. Colon is in her late fifties and is worried that she may never be able to afford retirement.

117.    Ms. Colon has high blood pressure. She worries that the stress surrounding her attendance at Sanford-Brown and the Department's failure to resolve her borrower defense application negatively affects her health.

118.    Plaintiffs feel frustrated by the government's failure to resolve their borrower defense applications.

119.    Plaintiffs believe that a response to their applications would provide much-needed closure.

120.    Ms. Carr, who is an air force reservist, believes that every person is entitled to due process and that she has not received hers because her application has not been decided. For Ms. Carr, the fact that she has waited for over four years without an answer feels far more unfair than receiving a timely response, regardless of the outcome.

121.    Waiting so long for her application to be resolved has made Ms. Colon feel that the government does not care about the American people and does not understand the human consequences of student loan debt. Ms. Colon feels like she is a pawn in a political game. She feels cheated and neglected by the Department and its refusal to resolve her application.

122.    Plaintiffs have been, and continue to be, harmed by the Department's credit reporting of their federal student loans while their applications are pending.

123.    The Department reports (or causes to be reported) Plaintiffs' loan information to credit bureaus on a monthly basis. *See* 20 U.S.C. § 1080a; 34 C.F.R. § 682.208(a).

124.    On information and belief, Plaintiffs' federal student loans contribute to their credit scores, which are low. Plaintiffs' poor credit has also caused them additional emotional distress and has made them feel socially isolated.

125.    Ms. Carr's credit report shows that in each month since Ms. Carr submitted her borrower defense application in March 2015, the Department has reported her federal student loans, or caused them to be reported, as in "collection" status and be marked with a "potentially negative" warning.

126.    Ms. Carr's credit report shows that in each month for the past two years (the only time period for which such data is shown), the Department has reported or caused to be reported

an ever-increasing balance on her federal student loans, with a total balance increase of over $1,500.

127.    Ms. Colon's credit report shows that in certain months since Ms. Colon submitted her borrower defense application in March 2015, the Department has reported or caused to be reported her federal student loans as in "delinquent" status.

128.    Ms. Colon's credit report shows that the Department has reported or caused to be reported an increasing balance on her federal student loans, with a total balance increase of over $3,000 in the past two years.

129.    In the last four years, each Plaintiff has had at least one credit card application rejected. On information and belief, each Plaintiff was rejected due to her low credit score.

130.    Since their applications have been pending, each Plaintiff has found it impossible to secure an affordable or reliable car.

131.    Ms. Carr has not applied for a car loan because of her poor credit. She has access only to a car that cannot reliably travel more than thirty miles.

132.    Ms. Colon applied for a car loan, but was approved only for a subprime loan with an interest rate of approximately 18%. As a result, Ms. Colon has had to rely on family to help make car payments.

133.    Because Plaintiffs have no or limited access to credit, they cannot pay for unexpected or emergency expenses.

134.    For example, Ms. Carr cannot book a hotel room or rent a car which she needs to travel any distance beyond the 30 miles her car will allow because she does not have access to a credit card.

135.    Ms. Carr's housing situation is precarious. She is worried that she will soon be

forced to move out of her current apartment and that, due to her poor credit, it will be difficult or impossible to find new housing.

136.    Ms. Colon feels hopeless about her credit. She can see others around her using their credit to invest and to build their assets. However, she feels that because her credit was destroyed by her student loans, she cannot buy a home, invest, or plan for her retirement.

137.    Plaintiffs have been, and continue to be, harmed by the mounting interest on their loans, which increases their total loan balance.

138.    Since Ms. Carr submitted her borrower defense application, the total balance on her loans has increased over $2,300.

139.    Since Ms. Colon submitted her borrower defense application, the total balance on her loans has increased over $5,500.

140.    Plaintiffs have been harmed, and are at risk for future harm, from the Department's collection activity while their applications are pending.

141.    Despite Ms. Carr's submission of her application, the Department attempted to collect on Ms. Carr's loans by Treasury offset. It was only through Ms. Carr's own diligence and the assistance of counsel that Ms. Carr was able to stop the offset before her tax refund was seized.

142.    In 2017, the Department directed that Ms. Carr's loans be placed in a "stopped collection" status, at its sole discretion.

143.    Despite Ms. Colon's submission of her application, she continued to experience collection actions. For example, in April 2017, Ms. Colon received a letter stating that she was "at least 210 days past due and severely delinquent" and that "[t]o avoid default, [she] must take action immediately." The letter listed "serious consequences" that could arise from default,

including: the default would be reported to credit reporting agencies and "could impact [Ms. Colon's] credit score"; "[her] debt may increase because of late fees, capitalized interest, collection fees and other costs"; her wages may be garnished; her state and federal tax refunds and other payments may be offset; and she may be subject to "legal action."

144.    In June 2017, the Department, at its sole discretion, directed that Ms. Colon's loans be placed in forbearance.

145.    On January 29, 2019, Ms. Colon received a bill stating that she owed monthly payments of $728.13 beginning on April 17, 2019.

146.    Through her own diligence and the assistance of counsel, Ms. Colon was able to contact the Department to request a reinstated forbearance while her borrower defense application remains pending. On April 22, 2019, Ms. Colon was approved for a ten-year forbearance.

147.    Because the forbearance and stopped collections status are at the sole discretion of the Department, Plaintiffs face the threat of resumed collection activity on these loans by Defendant at any time, including the threat of collection litigation.

148.    If and when Defendant resumes collection on those loans, Plaintiffs will be forced to make payments on loans they assert they do not owe, attempt to negotiate a deferment or forbearance that temporarily relieves them of the obligation of making payments, or be in default on their loan obligations.

149.    When borrowers default on federal loans, they are subject to coercive collection mechanisms, including wage garnishment and tax offset. They are also subject to collections litigation. Plaintiffs' federal loans have no statute of limitations. All of Plaintiffs' student loans are presumptively non-dischargeable in bankruptcy.

*Previous Procedural History*

150.    On November 12, 2017, Plaintiffs filed a lawsuit seeking a declaratory judgment that their loans were unenforceable due to Sanford-Brown's misconduct. *Colon et al. v. DeVos et al.*, No. 17 Civ. 8790 (KPF).

151.    The Secretary moved to dismiss Plaintiffs' complaint, arguing, among other things, that the Department should decide Plaintiffs' borrower defense applications in the first instance because "[P]laintiffs themselves invoked [the Department's] administrative process when they filed their [borrower defense] applications in 2015" and the Department was "still adjudicating applications." Mem. of Law in Support of Mot. to Dismiss, *Colon et al. v. DeVos et al.*, No. 17 Civ. 8790 (KPF), ECF No. 60 at 20-21.

152.    The Secretary stated that, as of April 6, 2018, "Plaintiffs' borrower defense applications [we]re pending before the Department," *id.* at 1, and that "[t]he Department ha[d] not yet decided whether to approve plaintiffs' applications," *id.* at 8.

153.    The Secretary claimed that the Department "continues to evaluate [borrower defense] applications." *Id.* at 20.

154.    On February 25, 2019, the Court issued an opinion stating that "the Court sympathizes with Plaintiffs' frustration over the lengthy delays in the processing of their applications," but granting the Secretary's motion to dismiss the declaratory judgment claim on sovereign immunity grounds. Op. & Order, *Colon et al. v. DeVos et al.*, No. 17 Civ. 8790 (KPF), ECF No. 60 at 85 at 2.

155.    Plaintiffs now bring this action to challenge the Department's lengthy delay in processing their applications and failure to notify them that their borrower defense applications have been resolved.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
*Unlawful Withholding or Unreasonable Delay in Violation of the*
*Administrative Procedure Act, 5 U.S.C. § 706(1)*

156.    The APA authorizes this Court to "compel agency action" that has been "unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

157.    The Secretary has a mandatory duty to grant or deny borrower defense applications on their merits, and notify applicants of the basis of her decision.

158.    Defendant has unlawfully withheld and/or unreasonably delayed resolving Plaintiffs' borrower defense applications, in violation of the APA, the HEA, the Secretary's regulations, and the terms of Plaintiffs' student loan notes.

### SECOND CAUSE OF ACTION
*Arbitrary and Capricious Agency Action in Violation of the Administrative Procedure Act, 5*
*U.S.C. § 706(2)(A).*

159.    The APA prohibits agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

160.    Defendant has acted in a manner that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law by, among other actions:

   a.   Refusing to resolve Plaintiffs' applications for over four years;

   b.   Adopting an informal policy not to resolve borrower defense applications, including Plaintiffs'; and

   c.   Constructively denying Plaintiffs' borrower defense applications, by denying the existence of such relief in its 2015 letters to Plaintiffs, and refusing to resolve Plaintiffs' borrower defense applications for over four years.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Declare that the Department unlawfully withheld and/or unreasonably delayed resolving Plaintiffs' borrower defense applications;

B. Declare that the Department's failure to resolve Plaintiffs' borrower defense applications is arbitrary and capricious;

C. Compel the Department to resolve Plaintiffs' borrower defense applications and notify Plaintiffs in writing of the grant or denial of their applications, attendant relief (if any) to which they are entitled, and the basis of those determinations, within sixty days;

D. Award attorneys' fees as authorized by law; and

E. Grant such further relief as may be just and proper.


Dated: July 16, 2019

/s/ *Eileen M. Connor*
Eileen M. Connor
Toby Merrill
Victoria Roytenberg (admission forthcoming)
LEGAL SERVICES CENTER OF HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
(617) 522-3003
econnor@law.harvard.edu


Danielle Tarantolo
Jane Greengold Stevens
Shanna Tallarico
Jessica Ranucci
NEW YORK LEGAL ASSISTANCE GROUP
7 Hanover Square
New York, NY 10004
(212) 613-5000
dtarantolo@nylag.org


*Counsel for Plaintiffs*

24